STATE OF NEBRASKA, EX REL. JOSEPH EINSTEIN, RELATOR, V. HOMER H. NORTHUP ET AL., RESPONDENTS.

FILED OCTOBER 16, 1907. No. 15,187.

1. Cities .of Second Class. Under the provisions of section 1, art. I, ch. 14, Comp. St. 1903, each village in this state containing the population required by the statute becomes a city of the second class without any action being taken on the part of the municipality.

2. ———: ELECTION OF OFFICERS. At the time the board of trustees of the village of Arapahoe passed a resolution and ordinance declaring the population sufficient to make it a city of the second class and providing for the election of city officers the village had less than the requisite number of inhabitants to constitute it such a city. At the time of election the population had increased so that at that time it had the requisite number. *Held*, That, though the action of the village board in providing for the election of city officers was at that time unauthorized, this would not invalidate or render void the election of such officers.

ORIGINAL proceeding in *quo warranto* to determine the right of respondents to exercise the duties of the office of councilmen of the city of Arapahoe. *Judgment against respondents Schwerdtfeger and Tomblin.*

*W. T. Thompson, Attorney General,* and *W. S. Morlan,* for relator.

*Roscoe Pound, John C. Stevens* and *Flansburg & Williams, contra.*

LETTON, J.

This is a *quo warranto* proceeding brought by the attorney general upon the relation of Joseph Einstein, an inhabitant of the village of Arapahoe, against Homer H. Northup, Frank A. Brewster, George M. Schwerdtfeger and Fred F. Tomblin, claiming to act as councilmen of the city of Arapahoe, questioning the respondents' right to exercise the duties of the office of councilman; the relator's contention being that no legal incorporation of the city of Arapahoe as a city of the second class has ever taken place, that the office of councilman of said city has no legal existence, and that the officers of the village of Arapahoe are entitled to administer the government of the municipality.

The village of Arapahoe has been under village government for more than 30 years. During this period there has been a slow but steady growth in the population. In the year 1906 the board of trustees of the village caused a census to be taken by the village clerk, Dick Emmett, for the purpose of ascertaining the number of inhabitants, with a view of incorporating as a city of the second class if it should prove that there were the requisite number of people within the corporate limits to allow of such an incorporation. The result of the enumeration taken and reported to the village board showed a population of 1,010 inhabitants. The census was taken in the months of May and June, 1906, and was reported to the board of trustees soon afterwards. No action was taken upon the report until the 11th day of January, 1907, when a resolution was passed declaring that the population of the city was more than 1,000 and that Arapahoe had become a city of the second class. At the same time an ordinance was passed dividing the city into two wards, and requiring the election of two councilmen from each ward, a mayor, and other city officers at the regular municipal election in 1907. The respondents, Northup and Brewster, were candidates for the office of councilmen from the second ward

at that election and were duly elected. Two other council-men were elected from the first ward. The vote upon mayor was a tie between T. L. Quier and Cyrus Horton. The village board declared the vote upon mayor to be a tie, and that no one was elected to that office, and thereupon appointed Horton to fill the vacancy. Quier then began a proceeding in the county court to contest the election of Horton, alleging that the city council had canvassed the votes and granted a certificate of election to Horton. Hor-ton answered,-asserting the invalidity of the election and disclaiming any interest in the alleged office, and it was adjudged that the election was regular and that Quier was entitled to hold the office of mayor. The two councilmen elected in the first ward refused to qualify. Thereupon the respondents Schwerdtfeger and Tomblin were ap-pointed by the other councilmen, Northup and Brewster, as councilmen for the first ward. After the organization of the new council it became apparent that it was their policy to issue no licenses to saloons or pool-rooms, which was a reversal of what had been the practice in Arapahoe for many years. On the 15th day of April, after the result of the election had been announced, and after the contest of the office of mayor had been instituted by Quier, the village board met and passed a resolution reciting, in sub-stance, that the resolution and ordinance whereby the form of government of the village was to be changed had been passed under a misapprehension of the true facts; that after eliminating from the enumeration "those who are personally known not to be residents of said village" there did not exist 915 actual residents; that an additional can-vass made of the village within the past ten days showed that there was not at the time of the passage of the or-dinance and resolution, nor has there been since, to exceed 960 inhabitants of the village of Arapahoe, and further reciting that the change of government was without au-thority of law, and that it rendered void all acts as a city of the second class; and it was resolved that the ordinance of incorporation be repealed and the village government as

it heretofore existed is still in existence. From this time on both the respondents, claiming as the city council of the city of Arapahoe, and the former board of village trustees, claiming to act as officers of the village of Arapahoe, sought to hold sway within the corporate limits. The relator Einstein then brought this action questioning the right of the respondents to the office of councilmen. Early in May, 1907, a census was taken by William Helman, H. A. Phillips and F. W. Wagner, whom the evidence shows were in sympathy with the retention of the village government. They returned 926 as being inhabitants upon the 11th day of January, 1907, the date when the resolution and ordinance were passed. When placed upon the witness stand to verify the accuracy of this census, it was conceded by them that a number of names had been omitted by mistake from their list in evidence, and it was shown that much of the information upon which the enumeration was based was merely hearsay, and that in many cases the result was not given from the personal knowledge of the enumerator, but merely upon his judgment as to the facts which had been communicated to him by others. We are now asked to determine as a matter of fact from the enumeration made under the authority of the village board in May, 1906, and from this enumeration made in May, 1907, each including many names not shown by the other, and without clear, definite and reliable testimony, how many inhabitants there were in the village of Arapahoe upon the 11th day of January, 1907, a period remote about four months from the enumeration nearest in point of time. It must be evident that an accurate determination of the number of inhabitants at that time is impossible under such a condition of the evidence.

The persons whose eligibility to be considered as inhabitants is in question fall into several classes. For instance, in one class are persons under legal age whose parents reside in the village, but who are temporarily absent attending school or engaged in some employment. Persons of this class are entitled to be considered as inhabitants of

the village. On the other hand minors who are temporarily residing in Arapahoe, either attending school or under employment, but whose parents reside elsewhere, and who are still under their parents' control, we have excluded from the list. One of the later census takers very frankly concedes that both these classes were excluded in his enumeration—in the one case because he thought they were not inhabitants by reason of their parents not residing in Arapahoe, and in the other because, although the parents resided in Arapahoe, the children were not present, but absent attending school, or the like. It is clear that under any view, if persons belonging to one of these classes were excluded, those belonging to the other should have been included. Another class of persons whom we have included are unmarried persons of full age whose employment and home seems to be in Arapahoe, but who occasionally visit their parents at other points. Distinguished from this class, and excluded from consideration, are persons of somewhat like condition whose parents reside at other points, who keep their personal belongings, or a portion of them, at their parents' home, and consider it to be their home, and who are usually only absent therefrom for short periods of time. In such case it is our opinion that the home of the parent should be taken as the home of such person. Another class of persons whom we have included are inhabitants of the village whose household goods remain in their homes, but who have been absent for some time, either with the intention of looking for a new location or merely visiting or traveling, but who have not lost their domicile or legal residence in Arapahoe, and in whom the intention not to remain has not been disclosed.

Taking the enumeration of May, 1907, as shown by exhibit "D," as a basis, examining page by page, and determining according to established principles, as nearly as we can from the competent evidence, the question of whether the persons named were inhabitants of the village of Arapahoe on January 11, 1907, it appears that there

are 918 names of persons who are entitled to be considered in estimating the population. It is conceded by the relators that 13 names were omitted by mistake from this list, so that 931 names should be taken as being shown by exhibit "D." In arriving at this conclusion we have deducted from the list the names of many persons whom we think were not entitled to be considered as inhabitants. From testimony of the respondents we find that there were inhabitants whose names should have been counted, in addition to those named in exhibit "D," to the number of 57, making a total of 988 upon January 11, 1907, as near as we can determine from the evidence. Coming now to the Emmett list, while much of the testimony offered for the purpose of contesting the accuracy of the May, 1906, census is subject to the same infirmities as that offered with reference to the May, 1907, enumeration, still, viewed in the light of the foregoing principles, it discloses that the names of many persons were erroneously included who were not entitled to be considered as inhabitants of the village. With reference to this list, as also with reference to exhibit "D," it would be a useless and unprofitable task to set out the names and discuss the qualifications of each of the many persons whose right to be enumerated is attacked. The determination of the status of each and all of them falls within well-recognized principles, which have already been alluded to. It seems clear to us that since the enumeration of May, 1906, when critically examined, fails to show 1,000 inhabitants, and since from all the other evidence we have been unable to find that there were 1,000 inhabitants in the village upon the 11th day of January, 1907, the resolution for the incorporation as a city of the second class at that time was unauthorized. In the foregoing computations we have not included the names of persons who lived upon the Murray tract, which was sought to be included within the corporation after the city government was formed, nor those who came to the village after the 11th day of January. We find, however, that 27 persons left

the village between the 11th day of January and the 2d
day of April, the date of the election, and that 50 persons
became inhabitants during that interval.    This leaves a
net accession to the population of 23 persons which, added
to the number of inhabitants which were found on Janu-
ary 11, shows that more than 1,000 persons were inhabit-
ants of the village upon the day of election.

In *Osborn v. Village of Oakland,* 49 Neb. 340, it is said
by NORVAL, J., writing the opinion of this court, after
quoting the statutory provision, section 1, art. I, ch. 14,
Comp. St. 1895: "By the foregoing provision each village
in this state containing the population required by stat-
ute is a city of the second class without any action on the
part of the municipality, and it is the duty of the board
of trustees to divide the territory embraced therein into
not less than two wards, and call an election at the
proper time for the election of city officers."    *State v.
Holden,* 19 Neb. 249; *State v. Babcock,* 25 Neb. 709.  If
the village became a city of the second class without any
action on the part of the municipality as soon as it con-
tained 1,000 inhabitants, then Arapahoe became a city at
some time between the 11th day of January, 1907, and
the day of election.    It was a city of the second class
upon election day.    Whether or not it was such a city at
the time the village board called the election is not of
great materiality.    The village board merely provided ad-
ministrative detail for the change of form by their act in
providing for the election of city officers, and, even if they
erred in their judgment as to the conditions, the machinery
they provided was no less effective in evidencing the popu-
lar will.    As soon as the population reached more than
1,000 the village board became officers of the city.  *State
v. Babcock, supra.*   They left the ward boundaries as they
had previously fixed them.   The inhabitants had the right
to select a mayor and councilmen and other officers at the
time that the election was held.    They elected the re-
spondents Northup and Brewster as councilmen at that

time. Their right to hold the office is therefore unquestionable.

As to the other respondents, it is clear that the two councilmen from the second ward acting alone had no power to appoint them to the office of councilman. There is no special provision in the statute governing cities of the second class providing for the filling of vacancies in the office of councilman; but by the general election law, section 103, ch. 26, Comp. St. 1905, it is provided that vacancies in city offices shall be filled by the mayor and council. This does not mean by the mayor alone, nor by the council alone. Hence, the action of the two councilmen without the concurrence of the mayor in the appointment was invalid. No action by the mayor and council is alleged to have been taken, and the relator is entitled to a writ against the respondents, Schwerdtfeger and Tomblin, ousting them from the office of councilman of the first ward of the city of Arapahoe.

It is seldom that a case is presented to this court in which the evidence is so unsatisfactory as in this case. Nearly three months elapsed after the resolution and ordinance were passed before the date of the city election, and up until that time no proceedings were begun by any person seeking to question the authority of the board. It was not until after the election that there seemed to be any question in the mind of the relator as to the legality of the proceedings, and the delay resulted in making the evidence difficult to procure and unsatisfactory in its nature. We have considered throughout that, under the rule in this state, the burden of proof has been upon the respondents. *State v. Davis,* 64 Neb. 499. The relator, however, has furnished the largest quantum, and this, with the respondents' testimony showing the persons omitted, has supplied the necessary proof, though in such a confused and ill-ordered manner as to impose an unnecessary burden on the court.

For the reasons stated, we find for the respondents Northup and Brewster, and against the respondents

Schwerdtfeger and Tomblin.  Judgment and writ accordingly.  Costs taxed, one-half to relator, and one-half to the respondents ousted.

JUDGMENT ACCORDINGLY.